IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SAMUEL J. LANAHAN, JR.          *
                               *
v.                             *          Civil Action WMN-12-0040
                               *
ESTATE OF SHEILA S. LANAHAN    *
<u>et al.</u>                          *

        *     *     *     *     *     *     *     *     *     *     *

<u>MEMORANDUM</u>

Pending before the Court is Defendants' Motion to Dismiss, ECF No. 8.  The motion is fully briefed.[1] Upon consideration of the pleadings, facts and applicable law and for the reasons set forth below, the Court determines that Defendants' motion will be granted.

**I. BACKGROUND**

This case involves a breach of an alleged agreement between Sheila Lanahan and her husband, Samuel J. Lanahan, Sr. (Jack). Jack and Sheila Lanahan married in the late 1960s, and each had children from prior marriages.  Sheila's two children, Katherine S. Nevius and Theodore A. Nevius, are both Defendants in this case in their capacity as personal representatives of their mother's estate.  Jack's son, Samuel J. Lanahan, Jr., is the

_____

[1]Plaintiff has also filed a Motion for Leave to File a Sur-Reply. ECF No. 11.  As Defendants do not oppose the filing of the sur-reply and it addresses matters that Plaintiff could not have previously presented during the initial briefing, the Court will accept the pleadings and consider them in accordance with Local Rule 105.2(a).

Plaintiff.  Jack also had two daughters, Cecilia Ross and Eleanor Lanahan.

Jack predeceased Sheila, passing away on May 29, 1998.  His last will and testament, dated October 8, 1997, was entered into probate on June 12, 1998.  Pursuant to his will, the vast majority of his personal and real property was left to Sheila, as the surviving spouse.  Included in this devise, was the real property, known as "Boston," located in Trappe, on the Eastern Shore of Maryland.[2]  With respect to Boston, Jack's will also specified:

> Without hereby imposing any trust or legal or equitable obligation whatsoever, I express the hope, but do not require, that if my wife, SHEILA S. LANAHAN, shall survive me, she will provide in her Will that [Boston] shall be devised to my lineal descendants in accordance with a memorandum or letter which I may leave, or failing such letter or memorandum, in accordance with my wishes as she may know them . . .

ECF No. 1-4 at 5.

After spending her last years living at Boston, Sheila passed away on August 13, 2011.  At the time the Complaint was filed, on January 4, 2012, Sheila's Estate was being administered under the direction of the Register of Wills for Talbot County, Maryland.  Pursuant to Sheila's will, dated April 20, 2011, Boston is to be sold and a portion of the proceeds

---

[2] Jack and Sheila owned Boston as tenants by the entirety, so, by operation of law, at Jack's death his share of Boston automatically passed to Sheila as the survivor.

distributed directly to her two children, with the remainder
held in a Charitable Remainder Unitrust for the benefit of the
same children.  ECF No. 1-5 at 3.  Boston is currently listed
for sale at a price of $2,875,000.  See
http://www.realtor.com/realestateandhomes-detail/28068-Howell-
Point-Rd_Trappe_MD_21673_M52101-83803 (last visited: July 19,
2012).

Plaintiff Samuel J. Lanahan, Jr. filed the present suit on
January 4, 2012.  ECF No. 1.  The only claim he makes in his
suit is for a breach of contract.  Plaintiff alleges that, prior
to his death in 1998, Jack entered into an agreement with Sheila
regarding the disposition of their respective assets upon their
deaths.  Compl. at ¶ 20.  As part of the alleged agreement, Jack
promised to leave the majority of his assets to Sheila, without
restrictions, to ensure that Sheila would be cared for
throughout her life.  Id.  In exchange for this promise,
Plaintiff alleges that Sheila agreed that if she did not need to
sell Boston during her lifetime, then she would provide in her
will that it be devised to Jack's lineal descendants.  Id. at ¶
21.  Jack's October 8, 1997, will, consistent with these
allegations, left the majority of his assets to Sheila and
expressed his desire that his children would inherit Boston.

Plaintiff alleges that Sheila breached her agreement with
Jack when she failed to devise Boston to his children, and

instead directed that Boston be sold and the proceeds left for the benefit of her own children.  Plaintiff attempts to enforce the agreement as a third party beneficiary, as he alleges that Sheila's breach has deprived him of his right to ownership of Boston and the value of his interest in the property.  He is seeking compensatory damages in the amount equal to one-third of the net proceeds from the sale of Boston.  Neither of his sisters is a party to the suit.

## II. STANDARD OF REVIEW

In evaluating a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must accept as true all well-pled allegations of the complaint and construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.  See Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).  To survive dismissal, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  A court need not accept a plaintiff's legal conclusions as true, as "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.  Moreover, a court need not accept as true "allegations that contradict matters properly subject to judicial notice or by exhibit." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

### III. DISCUSSION

#### A. Jurisdiction

Plaintiff states that this Court has subject matter jurisdiction over this suit because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.  Compl. at ¶ 8; see 28 U.S.C. § 1332(a).  These requirements appear to be met, as Plaintiff is a resident of Oregon, the Defendant Personal Representatives are deemed to be residents of Maryland, see 28 U.S.C. § 1332(c)(2), and the value of Plaintiff's purported interest in Boston exceeds $75,000.

Notwithstanding, and even though neither party has raised the issue, as this matter involves an Estate that is being administered by the Orphans' Court in Talbot County, the Court must consider whether the probate exception to federal diversity jurisdiction applies in this matter.  See Vangrack, Axelson &

<u>Williamowsky, P.C. v. Estate of Abbasi</u>, 261 F. Supp. 2d. 352, 354 (D. Md. 2003) (citing to <u>Mansfield, C. & L. M. Ry. Co. v. Swan</u>, 111 U.S. 379 (1884)).  The "probate exception" prevents a federal court from exercising diversity jurisdiction over "certain" probate matters.  <u>Id.</u> at 360.  The Supreme Court explained the parameters of this exception in <u>Markham v. Allen</u>, stating that federal courts do not have jurisdiction to probate a will or administer an estate, and should not adjudicate any case in such a way that would (1) interfere with the probate proceedings, (2) assume general jurisdiction of the probate, or (3) assume control of the property in the custody of the state court.  326 U.S. 490, 494 (1946).  The Supreme Court further narrowed the confines of this exception in <u>Marshall v. Marshall</u>, explaining that when it stated in <u>Markham</u> that a federal court must not "interfere" with the state court proceedings, it simply was reiterating the "general principle that, when one court is exercising <u>in rem</u> jurisdiction over a <u>res</u>, a second court will not assume <u>in rem</u> jurisdiction over the same <u>res</u>."  547 U.S. 293, 311 (2006).  The Supreme Court also explained:

> Thus, the probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from disposing of property that is in the custody of a state probate court.  But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

Id. at 311 - 12.  Simply stated, a federal court may determine the rights of the parties, but it may not administer the assets of the estate.  Libonati v. Ransom, 664 F. Supp. 2d 519, 522 (D. Md. 2009) (citing Markham, 326 U.S. at 494).

Therefore, in light of these limitations, this Court has jurisdiction to determine whether Plaintiff has properly brought a claim for breach of contract and whether he is able to prove that he is entitled to enforce the contract.  Notwithstanding, if Plaintiff were to prevail, the Court would not be able to make a specific award of damages, so long as the property from which Plaintiff seeks a share of the proceeds is under the jurisdiction of the Talbot County Orphans' Court.  See Markham, 326 U.S. at 495 (holding that it was proper for the district court to declare only that petitioner was entitled to the net estate, even though petitioner sought a judgment ordering defendant executor to pay over the net estate); Foster v. Carlin, 200 F.2d 943, 648 (4th Cir. 1953) ("The fact that complainant prays for incidental relief which the federal court is without jurisdiction to grant does not prevent an adjudication by the federal court of the rights of the respective parties in an estate."); see also Estate of Abbasi, 261 F. Supp. 2d. at 363.

## B. Breach of Contract

To prevail in an action for breach of contract under Maryland law,[3] a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.  Taylor v. NationsBank, N.A., 776 A.2d 645 (Md. 2001).  A contract is formed when two parties having the authority to enter into an agreement exchange an offer and acceptance and manifest their mutual assent to be bound by the agreement.  Cochran v. Norkunas, 919 A.2d 700, 709 (Md. 2007); Chernick v. Chernick, 610 A.2d 770, 774 (Md. 1992).  Moreover, in order for such contract to be binding, it must be supported by consideration.  Beall v. Beall, 434 A.2d 1015, 1018 (Md. 1981).

According to the Maryland statute of frauds, when a contract involves an interest in real estate, such contract is not enforceable unless the contract itself, or a memorandum or note memorializing the contract, is in writing and signed by the party against whom it is being enforced.  See Md. Code Ann.,

---

[3] Federal courts must conform to the choice of law rules prevailing in the forum state in which they sit.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Maryland follows the rule of lex loci contractus, with a limited renvoi exception, to determine which state's law governs the terms of a contract.  Am. Motorists Ins. Co. v. ARTRA Group, Inc., 659 A.2d 1295, 1304 (Md. 1995).  The lex loci contractus is the jurisdiction in which the contract was "made."  Bethlehem Steel v. G.C. Zarnas & Co., 498 A.2d 605, 608 (Md. 1985).  As both parties to the alleged contract resided in Maryland at the time the contract was allegedly made and neither Plaintiff nor Defendants have suggested that another state's law should apply, this Court will use Maryland law to resolve this dispute.

Real Prop. § 5-104.  This statute applies to contracts to devise
that involve real property, as well as entire and nonseverable
contracts to devise both real and personal property.  <u>Unitas v.</u>
<u>Temple</u>, 552 A.2d 1285, 1290 (Md. 1989).  As the contract alleged
in the complaint is a contract to devise an interest in Boston,
it is subject to the statute of frauds.

Plaintiff concedes that the statute of frauds applies to
the alleged agreement, but contends that it would be
inappropriate for the Court to dismiss the complaint as barred
by the statute of frauds at this point in time because he has
alleged that there exists a writing that would satisfy the
statute.  This alleged writing is referenced in Jack's will,
which is an exhibit to the Complaint.  Plaintiff argues that,
based on this reference, the Court should infer that such
writing exists and contains Sheila's signature.  This inference
would allow the Complaint to survive the Rule 12(b)(6) motion
and entitle Plaintiff to seek discovery through which he hopes
to uncover this purported writing.

Though Plaintiff has made a valiant effort, he has not
convinced the Court that a binding agreement, written or
unwritten, plausibly exists as he contends.  It is true that
Jack's will expressed his "hope" that Boston be devised to his
lineal descendants "in accordance with a memorandum or letter
which [he] <u>may</u> leave."  ECF No. 1-4 at 5 (emphasis added).  It

9

would be unreasonable, however, to infer that these words mean that Jack left a writing that would satisfy the statute of frauds.  In the context of the will, any memorandum or letter that may have been left would most likely have been drafted unilaterally and merely stated what Jack hoped would happen to Boston.  It would not be reasonable to infer that a letter expressing Jack's desires would have been signed by Sheila and that it would have evidenced a binding agreement between the husband and wife.

Moreover, the very words of the paragraph that reference this writing state in unambiguous terms that Jack did not intend to create any legal or equitable obligation regarding the eventual disposition of Boston.  He stated that he "express[es] the hope, but do[es] not require" that Sheila devise Boston to his lineal descendants "in accordance with his wishes as she may know them."  Id. (emphasis added).  The paragraph refers to wishing and hoping, not to demanding or requiring as one would expect if a binding agreement had been made.  Further, Plaintiff's allegations assume that Jack's wishes were that Sheila would devise Boston to his lineal descendants upon her death, no matter what happened between the time of Jack's death and the time of Sheila's death.  To infer that the referenced writing encompassed a binding agreement requiring that Sheila devise Boston to Jack's lineal descendants under any

circumstances would be unreasonable and be contradictory to the unambiguous language of Jack's will.

Plaintiff has also produced a copy of a will signed by Sheila on the same day that Jack signed the will that was probated at his death.[4]  In this will, dated October 8, 1997, Sheila directed that, if Jack did not survive her and if she still owned it at her death, Boston was to be devised to Jack's lineal descendants, i.e., Plaintiff and his siblings.  See ECF No. 11-2 at 5.  Plaintiff argues that this document defeats the statute of frauds defense because it is a writing, signed by Sheila, that evidences the existence of the agreement alleged in the Complaint.  He also argues that it is a mirror image of Jack's will of the same date, and thus is a reciprocal will, which is enforceable as a contract itself under Maryland law.

In support of his argument that Sheila's will satisfies the statute of frauds, Plaintiff points to a case from the Maryland Court of Special Appeals.  In Collins v. Morris, the decedent entered into an oral agreement to sell his home to his friend, Mr. Morris, via an installment contract.  716 A.2d 384, 386 (Md. Ct. Spec. App. 1998).  Instead of entering into a written contract of sale, on October 17, 1991, decedent executed a will

---

[4] As this will was not referenced in the original complaint, the Court will treat it as being offered as an amendment to the Complaint to provide further support to the breach of contract claim.

that contained a provision devising his home to Mr. Morris upon condition that "[Mr. Morris] is buying [the property] for a contract price of $88,000.00 at a rate of $1,000.00 per month commencing November 1, 1991." Id. at 769.  Mr. Morris made a $12,000 down payment and began making the installment payments as prescribed by the terms of the will.  Decedent subsequently died in March 1992.

One of the questions presented to the Court of Special Appeals was whether the parties had entered into a valid land installment contract that did not violate the statute of frauds. Id. at 771-2.  The Court of Special Appeals held that the parties had indeed entered into an enforceable contract and that, though a will is freely revocable any time prior to the testator's death, it may constitute a memorandum of an agreement sufficient to satisfy the statute of frauds.  Id. at 775.  The Court of Special Appeals explained that the will sufficiently described the specific terms of the purported land contract and that it was consistent with testimony that had been given by the lawyer who prepared the will.  Id.

The Collins case is distinguishable from the facts before the Court in the present case.  The Collins will unambiguously stated that Morris was buying the property for a sum certain and specified the terms and duration of the installment payments to be made, while Sheila's October 8, 1997, will makes not a single

reference to any agreement with Jack or that her devise of Boston to Jack's children was conditioned on any sort of promise from Jack.  Simply put, a reading of Sheila's October 8, 1997, will does not create a plausible inference that in devising Boston to Jack's children she was performing on a contract to which she had bound herself in consideration for a promise from Jack that he would devise to her the majority of his assets.

Plaintiff also argues that Sheila's October 8, 1997, will itself is an enforceable contract because it is part of a reciprocal will that she created with Jack.  Surreply at 8.  He relies largely on Shimp v. Shimp, 412 A.2d 1228 (Md. 1980), to support this contention.  Shimp v. Shimp is quite instructive, as the Maryland Court of Appeals includes a thorough explanation of joint wills and carefully distinguishes between a will, which is revocable at any time, and the contractual obligations that may be created by a mutual will, which can be enforced even after the will is revoked.  See Id. at 1232.  The court also explained that it will only set aside "a solemn testamentary act of the deceased party" if there is "clear and explicit [proof], leaving no room for reasonable doubt" that a contract to devise was made.  Id. at 1233.

In Shimp, the Court found that this standard of proof was met because the joint will created by the husband and wife prior to the wife's death clearly and unambiguously set forth the

13

terms of the contract to devise.  Id.  In fact, the joint will
at issue was signed by both parties to the contract, specified
in unambiguous language how property was to be devised by the
survivor, and specifically stated that the joint will created a
common plan for the disposal of their property and was made "in
consideration of each of us waiving the right, during our joint
lives, to alter, amend or revoke [the joint will]. . . under any
circumstances after the death of the first of us to die."  Id.
at 1229.  This joint will is clearly distinguishable from
Sheila's October 8, 1997, will, which does not contain any
language, much less clear and explicit language, indicating that
the will cannot be revoked after Jack's death and that the will
was made in consideration for the promises made in Jack's
corresponding will.  Sheila's will actually contains the same
unambiguous language found in Jack's will stating that no legal
obligation is created with respect to the devise of her personal
property should she predecease Jack.  Though contractual
obligations can be created through a joint or reciprocal will,
it is not plausible that such an obligation was created when
Jack and Sheila executed their October 8, 1997, wills.

Finally, the Court notes that had Jack wanted to ensure
that Boston would go to his children once both he and Sheila
were deceased, he could have done so, particularly as Jack
certainly had the resources to engage competent counsel to

assist him.  He and Sheila could have created a joint will

similar to that created in <u>Shimp v. Shimp</u>, they could have

created reciprocal wills containing unambiguous language

regarding the ultimate disposition of Boston, or he could have

converted the type of estate in which he and Sheila owned Boston

so that she would only have an interest in the property during

her lifetime.  In view of these available tools and the absence

of any language even suggesting that Jack intended to create a

binding obligation with respect to the ultimate disposition of

Boston, the Court cannot plausibly infer that any contract to

devise was created between Jack and Sheila.[5]  As no contract

plausibly existed, there can be no breach of contract, so the

Complaint will be dismissed for failing to state a claim for

which relief can be granted.

## IV. CONCLUSION

For the reasons stated above,[6] the Motion to Dismiss filed

by the Defendants will be granted.  A separate order will

follow.

---

[5] Plaintiff also argues that the alleged agreement can be enforced
under a theory of part performance, <u>see</u> ECF No. 9 at n. 1.  This
theory will also fail because the Court has found that no
contract under which either party could have performed plausibly
existed.

[6] As the Court is dismissing the Complaint on the grounds
discussed above, it need not consider the other grounds raised
by Defendants in their Motion to Dismiss, i.e., that the alleged
contract lacked consideration, that Plaintiff lacked standing to

_____/s/_____

William M. Nickerson
Senior United States District Judge

DATED: July 24, 2012

---

enforce the contract, and that Plaintiff failed to join all
necessary parties.  <u>See</u> ECF No. 8.